**NOBBY LOBBY, INC., Plaintiff,**

**Circus, Circus, Inc., Intervenor,**

v.

**The CITY OF DALLAS, R.E. Bardin in his official capacity, and John Does 1–5 in their official capacities, Defendants.**

**Civ. A. No. 3–90–0963–H.**

United States District Court,
N.D. Texas,
Dallas Division.

April 24, 1991.

Richard A. Anderson, Anderson Bratton & Jagmin, Dallas, Tex., for Nobby Lobby.

Frank Shor, Aranson & Shor, Dallas, Tex., for Circus, Circus.

Thomas P. Brandt, Asst. City Atty., Dallas, Tex., for City of Dallas, et al.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

Before the Court are Defendants City of Dallas and R.E. Bardin's Motion to Reconsider, Motion to Alter or Amend and Alternatively for New Trial, filed April 11, 1991; Defendants' Motion to Amend and Make Additional Findings by the Court, filed April 11, 1991; Defendants' Supplement to Motion to Reconsider, Motion to Alter or Amend and Alternatively for New Trial, filed April 22, 1991; Intervenor Circus, Circus, Inc.'s Response to Defendants' Motion to Reconsider, filed April 22, 1991; Intervenor's Response to Defendants' Motion to Amend and Make Additional Findings by the Court, filed April 22, 1991; and Plaintiff Nobby Lobby, Inc.'s Response to Defendants' Motion to Reconsider, Motion to Alter or Amend and Alternatively for New Trial, filed April 22, 1991.

### I. Background.

This is a civil action brought pursuant to 42 U.S.C. § 1983 wherein Plaintiff Nobby Lobby, Inc. and Intervenor Circus, Circus, Inc. (referred to collectively as "Plaintiff") seek redress of alleged deprivations by Defendants the City of Dallas and several of its law enforcement officers (referred to collectively as "the City"), acting under color of state and municipal law, of rights secured by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.[1] Plaintiff also seeks damages and attorneys' fees, although, as explained below, those issues are not presently before the Court. The Court has jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1343(a)(3) and 2201.

On April 11, 1990, peace officers of the City of Dallas obtained a search warrant to enter one of Plaintiff Nobby Lobby, Inc.'s

---

1. The City finds this description of the nature of Plaintiff's claims "troubling" because no officers are before the Court in their individual capacities and because the Court's shorthand use of the term "the City" "blurs the distinction between the individual officers and the City and ... is indicative of the court's failure to vigorously examine the Plaintiff's and Intervenor's cases against the City of Dallas." Defendants' Motion to Reconsider, Motion to Alter or

Amend and Alternatively for New Trial, filed April 11, 1991, at 2 [hereinafter "Defendants' Motion to Reconsider"]. Merely because only the City and one officer in his official capacity are joined in this action does not mean that Plaintiff does not complain of the actions of several officers. Furthermore, because the Court finds that the City is liable for the actions of Bardin complained of by Plaintiff, the use of the shorthand reference "the City" is proper.

places of business, an adult bookstore known as Fantasyland. The following day Defendant Officer R.E. Bardin and other Dallas police officers executed the warrant and confiscated electronic video projection and computer equipment used in the presentation of allegedly obscene video tapes by Plaintiff.[2] Because the seized video machinery is rather sophisticated, seizing the equipment necessary to operate one peep show booth could, and sometimes did, render inoperable many more booths. Following the April 12 raid one of Plaintiff's employees, Lennie Wayne Simpson, was charged under Section 16.01 of the Texas Penal Code, which prohibits the unlawful use of criminal instruments.

Although the April 12 raid was not the first conducted by the City, it prompted Plaintiff Nobby Lobby, Inc. to file suit against the City of Dallas, Officer Bardin in his official and individual capacities, and five unnamed police officers in their official and individual capacities, asking the Court to enjoin the state criminal proceeding on the ground, among others, that application of Section 16.01 to the video and computer equipment seized by the City is unconstitutional. *See* Plaintiff's Complaint for Declaratory Relief, Preliminary Injunction, Permanent Injunction and Attorney Fees, filed April 23, 1990.

The Court by Order entered August 7, 1990 abstained from deciding Plaintiff's motion for a preliminary injunction pursuant to the doctrine established by *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, and granted the City's motion to dismiss. The primary reason for the Court's abstention was the fact that Plaintiff had not shown a pattern of conduct on the part of the City that would indicate that the City was acting in bad faith and with intent to harass Plaintiff.

Within a few days of that Order, police officers of the City of Dallas returned to Plaintiff's places of business and seized more property, prompting Plaintiff to move for reconsideration of the August 7 Order on the ground that by its repeated seizures the City was engaged in bad faith prosecution and harassment of Plaintiff. By that time, the City had conducted nine contested seizures. Circus, Circus, Inc.'s motion to intervene in this action was granted by Order entered September 7, 1990 because it asserted virtually identical claims against the City as Nobby Lobby, Inc. based on seizures of its video equipment under color of Section 16.01. The Court granted Plaintiff's motion to reconsider by Order entered December 5, 1990, and held a hearing on Plaintiff's motion for preliminary injunction on March 25, 1991.

Prior to the hearing, Defendant Bardin's motion to dismiss on the ground of qualified immunity was granted and the complaint against him in his individual capacity was dismissed. Bardin's motion was granted in part because he demonstrated that he acted at all times in the course of his official duties. Bardin's motion was granted also because he demonstrated that he consulted with the District Attorney of Dallas before each contested seizure and received official assurance that the seizures were considered legally proper. Although the Court found that the District Attorney's advice was without foundation in law, *see infra* Part IV, Bardin's reliance on that advice was not unreasonable. Accordingly, the Court found that Bardin was qualifiedly immune from this lawsuit.

The March 25 hearing concerned only Plaintiff's request for declaratory and injunctive relief. The issues of damages and attorneys' fees issues will be considered separately. *See* Tr. at 8. Accordingly, the only issue the Court addresses is Plaintiff's request for prospective equitable relief.

---

**2.** Several seizures are at issue in this case. Typically, the City seized property like the following: "1–Quasar booth monitor, 1–Booth Computer card, 1–Booth speaker[,] 1–Quasar video cassette player, 1–Commodore 64 keyboard, 1–Marquee tape in keyboard, 1–Quasar video monitor, 1–metal board with 5 Pico components & AC/DC power supply, 1–Model 1100 modulator system, Assorted coaxial cables and splitters, Assorted booth wiring and counter". Pl.Ex. 15 (Evidentiary Search and Arrest Warrant for Plaintiff's store called "Eros," dated August 16, 1990). Sometimes coin boxes, video tapes, and even entire peep show booths were seized.

By Memorandum Opinion and Order entered March 28, 1991 the Court abstained from deciding Plaintiff's motion to enjoin state criminal proceedings and dismissed that part of its complaint. The Court granted Plaintiff's motion for declaratory and injunctive relief and entered an Order granting the injunction on April 4, 1991. The City moved to reconsider, to alter or amend, and alternatively moved for a new trial on April 11, 1991. Plaintiff and Intervenor subsequently responded on April 22, 1991. Having carefully reviewed the pleadings and evidence on file in this case, including the transcript of the March 25 hearing and materials submitted with the parties' post-hearing pleadings, the Court withdraws and VACATES the Memorandum Opinion and Order entered March 28, 1991 and hereby enters this Memorandum Opinion and Order in its place pursuant to Federal Rule of Civil Procedure 52(b).

For the reasons stated below, the Court finds that the City acted in bad faith and with intent to harass when it seized Plaintiff's property under color of Section 16.01, and accordingly that the *Younger* abstention doctrine does not apply to this case. The Court GRANTS Plaintiff's motion for declaratory relief and for an injunction barring future unconstitutional seizures under the color of Section 16.01 of the Texas Penal Code; the injunction entered April 4, 1991 pursuant to the March 28 Memorandum Opinion and Order shall remain in effect. Because declaratory relief is less intrusive and because the practical effect of declaratory relief is the same as enjoining state court prosecutions of Plaintiff's employees, Plaintiff's request for an order enjoining pending criminal proceedings is DENIED. Defendants' motions to reconsider, to alter or amend, for new trial, and for additional findings by the Court are GRANTED in part and DENIED in part.

II. The *Younger* Abstention Doctrine.

A federal district court must abstain from exercising jurisdiction in a suit when state criminal proceedings are pending against the plaintiff at the same time. *See Younger v. Harris*, 401 U.S. at 41, 91 S.Ct. at 749 (reversing federal injunction of state

criminal prosecution "as a violation of the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances"). The *Younger* principle of abstention is based upon considerations of comity and federalism, *see id.* at 43–45, 91 S.Ct. at 750–51, and "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44, 91 S.Ct. at 750; *see Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975) (stating that *Younger v. Harris* "rests upon the traditional reluctance of courts of equity ... to interfere with a criminal prosecution").

█ The *Younger* doctrine applies to this case even though neither Nobby Lobby, Inc. nor Circus, Circus, Inc. is charged with a violation of Section 16.01. In *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the Supreme Court confronted a situation similar to the one at hand. At the time the appellees (including the plaintiff employer Miranda) filed their federal complaint seeking injunctive relief, no state criminal proceedings were pending against them, although two of their employees had been charged with violating obscenity statutes. The Supreme Court held that the appellees

had a substantial stake in the state proceedings, so much so that they sought federal relief, demanding that the state statute be declared void and their films returned to them. Obviously, their interests and those of their employees were intertwined.... Absent a clear showing that appellees ... could not seek the return of their property in the state proceedings and see to it that their federal claims were presented there, the requirements of *Younger v. Harris* could not be avoided on the ground that no criminal prosecution was pending against appellees....

*Id.* at 348–49, 95 S.Ct. at 2291. The Court made clear that the *Younger* rule that

state courts be allowed to try state cases without federal court interference applies even "where the interference is sought by some, such as appellees, not parties to the state case." *Id.*

Furthermore, the *Younger* doctrine may apply even where the federal complaint is brought before state criminal charges are filed. In *Hicks v. Miranda,* the Supreme Court held that "where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* should apply in full force." *Id.* at 349, 95 S.Ct. at 2292.

The *Younger* doctrine demands that, absent satisfactory proof of harassment and bad faith on the part of the law enforcement officials, the federal complaint must be dismissed. *See id.* at 350, 95 S.Ct. at 2291 ("Unless we are to trivialize the principles of *Younger v. Harris,* the federal complaint should have been dismissed on the appellants' motion absent satisfactory proof of those extraordinary circumstances calling into play one of the limited exceptions to the rule of *Younger v. Harris* and related cases."); *Younger v. Harris,* 401 U.S. at 53–54, 91 S.Ct. at 755 (requiring a showing of bad faith, harassment, or other unusual circumstance before a federal court may enjoin a state criminal proceeding). Likewise, in *DeSpain v. Johnston,* 731 F.2d 1171, 1176 (5th Cir.1984), the Fifth Circuit stated that "[t]he *Younger* doctrine establishes a presumption that the federal courts should abstain in cases in which a state criminal proceeding is pending. This presumption is overcome by a showing of bad faith or intent to harass."

■ The Fifth Circuit has upheld injunctions in cases where bad-faith exceptions to the *Younger* doctrine were found by the district court. *See Fitzgerald v. Peek,* 636 F.2d 943, 944 (5th Cir.) (upholding permanent injunction against prosecution of plaintiffs for having exercised First Amendment rights and holding that "the threat of multiple or repeated prosecutions is not necessary to establish bad faith prosecution"), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *Shaw v. Garrison,* 467 F.2d 113, 122 (5th Cir.) (Wisdom, J.) (holding that a finding of bad faith prosecution is subject to "clearly erroneous" standard on review and that such a finding "establishes irreparable injury both great and immediate for purposes of the comity restraints discussed in *Younger*"), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972); *Krahm v. Graham,* 461 F.2d 703, 707 (9th Cir.1972) (affirming finding of bad faith prosecutions in case where seizures of allegedly obscene materials "can put the plaintiffs out of business without ever convicting them of anything" and holding that "[i]n the vital area of First Amendment rights it is just as easy to discourage exercise of them by abusing a valid statute as by using an invalid one"); *Duncan v. Perez,* 445 F.2d 557, 560 (5th Cir.) (upholding injunction and finding of bad faith prosecution as "official lawlessness" in area with history of hostility to federally protected rights), *cert. denied,* 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254 (1971); *see also McGuire v. Roebuck,* 347 F.Supp. 1111, 1125 (E.D.Tex.1972) (finding bad faith prosecution of unconstitutional ordinance and granting declaratory and injunctive relief).

In *Universal Amusement Co. v. Vance,* 559 F.2d 1286 (5th Cir.1977), which also involved the use of Section 16.01 of the Texas Penal Code to seize equipment used to project allegedly obscene films, the Fifth Circuit discussed some of the factors a court may consider in deciding the bad faith issue. The *Universal* court found that seizure of a movie projector provided "substantial support" for a finding of harassment and bad faith prosecution. *Id.* at 1295. In addition, the court noted the "multiplicity of the seizures" and evidence indicating that "law enforcement officials recognized they were acting illegally and knew they could not obtain convictions...." *Id.*

In the present case, the obviously important parallel with *Universal* is that the City has repeatedly seized Plaintiff's video projection and computer equipment and

charged its employees with criminal offenses under Section 16.01. Officer Bardin, together with other Dallas police officers, executed warrants and seized property at "Video Stop" on May 17, 1989; at "Talk of the Town" on October 20, 1989; at "Fantasyland" on April 12, 1990; at "Kazbah" on April 20, 1990; at "Videoland" on April 20, 1990; at "Talk of the Town" on July 12, 1990; at "Fantasyland" on August 10, 1990; at "Eros" on August 10, 1990; and at "Videoland" on August 10, 1990. *See* Def.Ex. 6, 12, 5, 7, 11, 13, 8, 9, 10. Although it is settled that "the threat of multiple or repeated prosecutions is not necessary to establish bad faith prosecution", *Fitzgerald v. Peek,* 636 F.2d at 944, the multiple seizures and prosecutions in this case indicate bad faith.

The most significant fact demonstrating the City's bad faith is that all of the seizures at issue in this case were made after the Fifth Circuit's ruling in *Universal.* The undisputed evidence at the hearing showed that the decision to seize video equipment under Section 16.01 was made by officials who were fully aware of the *Universal* ruling. Indeed, Officer Bardin is an expert on obscenity law enforcement and he contacted the office of the Dallas District Attorney before each seizure of video equipment under color of Section 16.-01. Furthermore, the seizures continued even after Plaintiff filed the present lawsuit against the City based on the Fifth Circuit's *Universal* ruling. The Court finds this knowing and deliberate attack on the constitutional principles enunciated in *Universal Amusement Co. v. Vance* is by itself adequate proof of the City's bad faith and intent to harass Plaintiff. *See Universal Amusement Co. v. Vance,* 559 F.2d at 1293–99 (citing *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), in discussing the constitutional requirement of an adversary hearing when materials presumptively protected by the First Amendment are seized).

Furthermore, in light of the Fifth Circuit's ruling in *Universal,* the Court finds that the City did not have a good-faith belief it could gain valid convictions under its application of Section 16.01. This is particularly true in light of the fact that the ruling of the district court in *Universal* has been adopted by the highest criminal court of Texas. The short of the matter is that there was no tenable legal foundation for the City's seizure of video and computer equipment under color of Section 16.01. *See infra* Part IV.

Although the City has shown that some persons charged under Section 16.01 as it is applied in this case have chosen to plead guilty to that offense pursuant to plea bargains, the City is unable to cite a single case where a person charged under that statute has gone to trial and been convicted. Because the Supreme Court has held that a person may knowingly and voluntarily plead guilty even if he denies that he committed a criminal act, *see North Carolina v. Alford,* 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), bargained-for pleas do not offer very strong support for the City's contention that it had a good-faith belief in the likelihood of gaining valid convictions. Accordingly, just as prosecutorial inaction demonstrated bad faith in *Universal,* the City's apparent unwillingness to try a Section 16.01 case along with its awareness of the *Universal* ruling suggests that law enforcement officials knew they were acting illegally and could not obtain valid convictions.

In any event, the Fifth Circuit has held that a plaintiff need not show that a prosecution could not result in a valid conviction in order to demonstrate the applicability of a *Younger* bad-faith exception. In *Wilson v. Thompson,* 593 F.2d 1375, 1387 (5th Cir. 1979), the Fifth Circuit held that enjoining state criminal proceedings is proper where the plaintiff shows that the conduct the state seeks to deter is constitutionally protected and the state's prosecution is motivated at least in part by a purpose to deter that conduct. As demonstrated below, *see infra* Part III. B., the facts of this case show that the contested seizures were motivated at least in part by a purpose to deter constitutionally protected conduct.

Also, the evidence in the case shows that, by disassembling and seizing the video banks and computer equipment controlling

the video projection equipment, the City effectively shut down a significant portion of Plaintiff's business. Because the video equipment allowed the display of sixteen different films simultaneously, the effect of the contested seizures was not to prevent the showing of one allegedly obscene film, but to prevent the showing of any film in the affected booths until replacement parts could be obtained and installed. In other words, the City could effectively seize Plaintiff's entire inventory of films without touching a single one of them, simply by seizing the projection equipment under color of Section 16.01. "In the vital area of First Amendment rights it is just as easy to discourage exercise of them by abusing a valid statute as by using an invalid one." *Krahm v. Graham*, 461 F.2d at 707 (affirming finding of bad faith prosecutions in case where seizures of allegedly obscene materials "can put the plaintiffs out of business without ever convicting them of anything").

Finally, the City's open intention to put Plaintiff out of business by other means, and its apparent inability to do so, reinforces the Court's finding that the contested seizures were made in bad faith and with intent to harass Plaintiffs. *See infra* Section III. B.; Defendants' Motion to Reconsider at 18 (citing Plaintiff's numerous City Code violations and stating that "Plaintiff and Intervenor have no right to exist as sexually oriented businesses."); *Id.* Def.Ex. 143 (Third Amended Motion for Contempt filed by the City of Dallas in Civil Action No. 89–1527–R (N.D.Tex.) seeking to terminate all operations at several of Plaintiff's sexually oriented businesses on basis of violations of Dallas City Code).

Accordingly, the Court finds on the basis of the evidence before it that the contested seizures were performed in bad faith and with intent to harass Plaintiff, and therefore that the rule of *Younger v. Harris* does not require the Court to abstain from considering the merits of Plaintiff's request for injunctive relief. For the same reason, the Court need not abstain from reaching the merits of Plaintiff's request for declaratory relief. *See Samuels v.*

*Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971) ("We therefore hold that, in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well.").

Although enjoining pending criminal prosecutions of Plaintiff's employees is justified by the bad-faith exception to the *Younger* doctrine and the facts of this case, because declaratory relief is a less intrusive remedy that will have the same practical effect as an injunction, *see id.*, the Court DENIES Plaintiff's motion for an injunction against pending state criminal prosecutions of its employees under Section 16.01. Because the Court declines to issue an injunction, there is no reason to address the requirements of the Anti–Injunction Act, 28 U.S.C. § 2283, which permits a federal court to enjoin state court proceedings only where "expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *See Milner v. Burson*, 470 F.2d 870, 874 (5th Cir.1972) (stating that "before reaching the question of whether it could act within an exception to § 2283, a federal district court is required by *Younger* to determine whether general equitable principles support its interference in state criminal prosecutions"), *cert. denied*, 411 U.S. 981, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *In re Fussell*, 928 F.2d 712, 715 (5th Cir.1991) (stating that the Fifth Circuit has indicated that a federal court order enjoining a state criminal prosecution must satisfy the requirements of *Younger* and the Anti–Injunction Act).

### III. Municipal Liability Under 42 U.S.C. § 1983.

The City contends that the Court erred in granting declaratory and injunctive relief because there was no evidence presented at the hearing to find that Bardin and the other police officers acted according to an

official policy of the City of Dallas. The City contends that, absent proof of such a policy, it cannot be held liable pursuant to the decision of the Supreme Court in *Monell v. New York City Department of Social Services.*

For the reasons given below, the Court holds that *Monell* does not apply to the case at hand, where Plaintiff seeks only prospective injunctive and declaratory relief against the City for unconstitutionally enforcing a state criminal statute. Furthermore, even if *Monell* does apply to the present case, the Court finds that the evidence shows that the contested seizures were conducted pursuant to an official policy or custom as defined by *Monell* and its progeny.

### A. *Monell* Does Not Apply.

■ *Monell* concerned the liability of municipal officials, sued in their official capacities, where plaintiffs sought damages based on the municipality's "official policy" of forcing pregnant employees to take unpaid leaves of absence. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 661–62, 98 S.Ct. 2018, 2020–21, 56 L.Ed.2d 611 (1978). Finding that municipalities and their officials were "persons" under the terms of Section 1983, the Court established a standard for determining municipal liability.

Our analysis of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

*Id.* at 690, 98 S.Ct. at 2035–36 (footnotes omitted). *Monell* unquestionably involved an official municipal policy as the moving force of the alleged constitutional violations. Accordingly, the Court found the City of New York liable for retrospective relief in the form of back pay. *See id.* at 661–62, 694–95, 98 S.Ct. at 2020–21, 2037–38.

In the present case, the City, relying on *Monell,* argues that in order for Plaintiff to prevail, there must be proof that Bardin and the other Dallas police officers were acting pursuant to an official policy of the City. *Monell* does not apply here. The present dispute is solely over the propriety of prospective relief: Plaintiff wants a declaration that Section 16.01 was unconstitutionally applied by the City's police officers and an injunction against the City's wrongful use of that statute. The Court finds that the Supreme Court did not intend to apply any "official policy or custom" requirement to preclude an action seeking prospective relief against a municipality or its officials for unconstitutionally enforcing state laws.

The *Monell* Court established an "official policy or custom" requirement to limit *damage* awards in Section 1983 lawsuits. That requirement limits the imposition of financial liability on municipalities based solely on a *respondeat superior* theory.

The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that *recovery* from a municipality is limited to acts that are, properly speaking, act "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (last emphasis added).

In decisions following *Monell* the Supreme Court has considered only the issue of municipal liability for money damages. *See, e.g., City of St. Louis v. Praprotnik,* 485 U.S. 112, 116, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1986) (finding municipality not liable for damages for wrongful discharge of employee); *Pembaur v. City of Cincinnati,* 475 U.S. at 474, 106 S.Ct. at 1295 ("Pembaur sought $10 million in actual and

**810**

$10 million in punitive damages, plus costs and attorney's fees."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 812, 824, 105 S.Ct. 2427, 2430, 2436, 85 L.Ed.2d 791 (1985) (reversing ruling upholding jury award of $1,500,000). *Monell* and its progeny are silent as to the issue presented by the case at hand—the requirements for granting strictly prospective relief from deprivations of constitutional rights. After all, *Monell* concerned a constitutional challenge to a statute enacted by the city which clearly was the city's official policy. There was no need for the Court to consider the question of whether proof of an "official policy or custom" would be required to enjoin the alleged unconstitutional enforcement of state laws, which by statute are enforced by local officials.

The Court can find in the case law no reason to impose an "official policy or custom" requirement in a situation where prospective relief alone is at issue and there is no threat of municipal financial liability. *See Chaloux v. Killeen,* 886 F.2d 247, 249–51 (9th Cir.1989) (finding that *Monell*'s "justification for limiting an action for damages is notably absent when the relief sought is an injunction halting the enforcement of an unconstitutional statutory scheme" and concluding that the trial court erred in applying *Monell* to a case seeking only prospective relief) (citing *Wood v. Strickland,* 420 U.S. 308, 315 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975) for recognizing that "immunity from damages does not ordinarily bar equitable relief as well"); *Familias Unidas v. Briscoe,* 619 F.2d 391, 402–05 (5th Cir.1980) (holding that a county could not be held liable for damages under the *Monell* doctrine but granting declaratory relief because the contested statute was "facially defective in pursuing its aim more broadly than First Amendment jurisprudence will allow" and accordingly that "the implementation of this constitutionally infirm statute against [plaintiffs] was, of course, impermissible").

Accordingly, the Court finds that the *Monell* "official policy or custom" requirement does not apply to the present dispute, where only prospective relief is at issue.

**B. The *Monell* Standard is Met.**

■ Although the City asserts that the Court "fail[ed] to vigorously examine" the case before it, Defendants' Motion to Reconsider at 2, and "ignore[d] well established doctrines concerning municipal liability", *id.,* the Court is well aware that the United States Supreme Court has established the standard for municipal liability under 42 U.S.C. § 1983. As just discussed, the Court finds that the *Monell* "official policy or custom" requirement does not apply here; nonetheless, the Court also finds that the contested seizures were performed in accordance with an official policy or custom of the City of Dallas.

The standard for municipal liability under Section 1983 was established by the Supreme Court in *Monell v. New York City Department of Social Services.*

We conclude ... that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. New York City Department of Social Services,* 436 U.S. at 694, 98 S.Ct. at 2037–38. The *Monell* Court made clear that a municipality may be liable for acts of its officials when the municipality's "policy or custom" is the "moving force" of the constitutional deprivation. *Id.*

"*Monell* is a case about responsibility." *Pembaur v. City of Cincinnati,* 475 U.S. at 478, 106 S.Ct. at 1297. "The 'official policy' requirement was intended to distinguish the acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 479–80, 106 S.Ct. at 1298. Furthermore, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481, 106 S.Ct. at 1299.

Under the *Monell* doctrine, a policy or custom may be found either in the form of an official policy statement or in the nature of a "persistent, widespread practice of city officials or employees ... so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); *see Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (en banc) (defining municipal liability under Section 1983 in order to "promote consistency in the adjudication of the rights of injured persons and the inhabitants of municipalities"). Indeed, as the Supreme Court said in *Monell*,

although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell v. New York City Department of Social Services*, 436 U.S. at 690–91, 98 S.Ct. at 2036.

In the present case, Defendants are in the unusual position of arguing simultaneously that Officer Bardin, the Dallas police officer who participated in all of the contested seizures, is entitled to qualified immunity because he acted as a City official in accordance with the counsel of the Dallas District Attorney, and that the City is not liable for his actions because Bardin did not act according to City policy or custom. A brief review of undisputed facts in this case conclusively demonstrates that Officer Bardin made the contested seizures in accordance with a "custom or policy" of the City as defined by *Monell* and its progeny.[3]

It is undisputed that Officer Bardin, together with other Dallas police officers, executed warrants and seized property at "Video Stop" on May 17, 1989; that Bardin and other Dallas police officers seized property at "Talk of the Town" on October 20, 1989; that Bardin and other Dallas police officers seized property at "Fantasyland" on April 12, 1990; that Bardin and other Dallas police officers seized property at "Kazbah" on April 20, 1990; that Bardin and other Dallas police officers seized property at "Videoland" on April 20, 1990; that Bardin and other Dallas police officers seized property at "Talk of the Town" on July 12, 1990; that Bardin and other Dallas police officers seized property at "Fantasyland" on August 10, 1990; and that Bardin and other Dallas police officers seized property at "Eros" on August 10, 1990. *See* Defendant R.E. Bardin's Motion for Summary Judgment, Motion to Dismiss and Brief, filed January 23, 1991, at 5–7 (reviewing undisputed facts) [hereinafter "Bardin's Motion for Summary Judgment"]; Defendants' Proposed Findings of Fact 1 and 2, filed March 11, 1991; Def.Ex. 6, 12, 5, 7, 11, 13, 8, 9, 10.

In short, we are here confronted not with an isolated incident involving a single municipal employee, but with a series of seizures conducted by Bardin and other Dallas police officers. This course of conduct demonstrates a persistent, widespread practice of seizing video equipment under color of Section 16.01. Indeed, the City contends that these seizures of video equipment constituted "widespread" and "across-the-board" enforcement of Section 16.01. Defendants' Response to Plaintiff's Motion for Reconsideration, filed September 20, 1990, at 7. As the Fifth Circuit has said, "[s]ufficient duration or frequency of

---

**3.** In discussing the undisputed facts in this case, the Court draws on pleadings submitted by all of the Defendants, and does so for several reasons. First, the Dallas City Attorney represented all of the Defendants and submitted all pleadings on their behalf. He also represented the Defendants at the March 25, 1991 hearing. Second, the Defendants submitted many pleadings jointly, and all joined in the Joint Pretrial Order. Third, at no time did any Defendant object to any statement of fact or legal argument advanced by another Defendant. Finally, the positions taken by the Defendants throughout the course of this action are not merely consistent, but are identical.

abusive practices, or other evidence, *must* warrant a finding of knowledge on the part of the governing body that the objectionable conduct has become customary practice of city employees." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir.) (emphasis added), *aff'd on rehearing*, 735 F.2d 861, 862 (5th Cir.1984); *see Berry v. McLemore*, 670 F.2d 30, 32 (5th Cir.1982) (stating that isolated instance of police misconduct is not the often repeated violations that constitute custom and policy under *Monell*), *overruled in part on other grounds by International Woodworkers v. Champion International Corp.*, 790 F.2d 1174, 1175–76 (5th Cir.1986).

It is undisputed that the duty of a police officer is to enforce the law and that all of the contested seizures were performed in accordance with this duty. *See id.* (stating that "Defendants have enforced the criminal instrument statute in good faith and across-the-board"). This fact alone should end the matter; it is unreasonable to suggest that a police officer who was "vigorously enforcing the law," Tr. at 164, over the course of "nearly two years", Defendants' Motion to Reconsider at 5, was not acting in accordance with an official policy. The City further states that Officer Bardin performed these seizures "within the scope of [his] discretionary authority and in the course of [his] official responsibilities" as a police officer of the City of Dallas. Bardin's Motion for Summary Judgment at 8.

It is undisputed "that Bardin was, at all times, acting pursuant to a warrant." *Id.* at 9; *see also* Tex.Code Crim.Proc.Ann. art 18.01(a) (Vernon Supp.1991) (defining "search warrant" as "a written order, issued by a magistrate and directed to a peace officer, commanding him to search for any property or thing and to seize the same"). The warrants Officer Bardin executed were valid on their face, *see* Bardin's Motion for Summary Judgment at 10, meaning that they ran in the name of "The State of Texas", identified the place to be searched and the property to be seized, commanded the peace officer to search the named place, and were dated and signed by a magistrate. *See* Tex.Code Crim.Proc. Ann. art. 18.04 (Vernon 1977). Following

the seizure of the equipment the Dallas Police Department provided Plaintiff with an inventory of the property seized. Also, when video tapes were seized, Plaintiff was provided notice that an adversary hearing to determine whether the video was obscene was available by contacting the City of Dallas through the City Attorney's office.

In addition to the fact that the warrants were issued by a "neutral and detached magistrate" of the municipal courts of the City of Dallas—indeed, several such magistrates—who found probable cause to issue them, Bardin's Motion for Summary Judgment at 12, Bardin "made a clear and conscious effort to meet every legal requirement when he sought and executed the warrants." *Id.* at 13. He did this by conferring with the Dallas County Criminal District Attorney before executing the warrants. *See id.* at 12–13; *see also* Defendants' Motion to Reconsider at 11 (stating that all of the seizures at issue in this case were made after conferring with the Dallas District Attorney's office). Not only was the District Attorney consulted before the contested seizures took place, but the uncontested evidence admitted at the hearing shows that he signed True Bills of Indictment, Informations, Affidavits for Arrest, and Consent Judgments that resulted from the City's enforcement of Section 16.01. In short, the Dallas District Attorney actively participated in the enforcement of Section 16.01 by authorizing the seizure of video and computer equipment and peep show booths.

It is also undisputed that the Dallas District Attorney is "elected by the qualified voters of . . . [Dallas] county" for a term of four years and is "commissioned by the Governor" of Texas. Tex. Const. Ann. art. 5, § 21 (Vernon 1955). "The criminal district attorney of has exclusive control of criminal cases . . . in the Courts of Dallas County". Tex.Gov.Code Ann. § 44.157(a) (Vernon 1988). The District Attorney "has all the powers, duties, and privileges in Dallas County that are conferred by law", *id.* (b), and he exercises those powers exclusively. *See id.* (d); *see also* Defendants'

Motion to Reconsider at 8 ("The District Attorney's office is the sole entity in charge of ... prosecutions."). Furthermore, "[i]t has always been the principal duty of the district and county attorneys to investigate and prosecute the violation of all criminal laws ... and these duties cannot be taken away from them by the Legislature and given to others." *Sheppard v. Alaniz*, 303 S.W.2d 846, 850 (Tex.Civ.App. —San Antonio 1957, no writ).

There is no question that a district attorney, acting alone or in concert with other municipal employees, may establish official policy for the purposes of *Monell* and Section 1983. *See Turner v. Upton County, Texas*, 915 F.2d 133, 136–37 (5th Cir.1990) (finding where district attorney and sheriff were accused of conspiring to violate civil rights that "actions of elected district attorney" were sufficient for imposition of municipal liability even though district attorney's jurisdiction was larger than that of sheriff), *cert. denied*, —— U.S. ——, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991); *Mairena v. Foti*, 816 F.2d 1061, 1065 (5th Cir.1987) (finding that district attorney's participation in the formulation of contested policy met the "policy or custom" requirement of *Monell* and upholding finding of municipal liability), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *Crane v. State of Texas*, 766 F.2d 193, 194–95 (5th Cir.) (denying suggestions for rehearing en banc) (finding Dallas District Attorney an elected public official responsible for Dallas County's relevant policy and rejecting "ingenious arrangements" concocted to avoid municipal liability), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985). Although the Dallas District Attorney is a county official, his official control over criminal cases and his participation in the decision to conduct the seizures indicates that the seizures were not conducted outside the municipality's official policy. Indeed, as noted above, Officer Bardin was granted qualified immunity from this suit in part because he received official assurance from the District Attorney that the seizures were legally proper.

Regardless of the District Attorney's participation in the seizures, it is undisputed that the City of Dallas was fully aware of the acts of Bardin and the other police officers who conducted the seizures. First of all, the City Attorney's office and "other members of the Dallas City government" participated in the decision to seize video equipment and peep show booths under color of Section 16.01. *See* Tr. at 107, 132. Second, the seizures continued not only after the present lawsuit was filed, but also after the City had responded to the action and persuaded the Court to abstain from enjoining pending criminal prosecutions under the *Younger* doctrine. *See* Memorandum Opinion and Order entered August 7, 1990. This issue was discussed at the March 25 hearing, when the issue of the City's bad faith was raised.

MR. REICH (Attorney for Plaintiff): Bad faith? Not one of these cases has been brought to trial. Sure, there is evidence that there were no contest pleas, pleas of convenience perhaps but three days after the Court abstained the Defendants go on a citywide raid and confiscate all the equipment they can get their hands on?

THE COURT: I must say that is a very telling matter. I will have to say to everybody it is.

MR. REICH: I am sorry, Your Honor.

THE COURT: I just say that is a very telling matter that I entered an order and within a few days the raids break out. I don't have a good explanation for that.

. . . .

MR. BRANDT (Assistant Dallas City Attorney): As far as the bad faith, the fact that the seizures stopped when the lawsuit was filed is evidence of good faith. We waited until Your Honor ruled and after that time whenever it was going to be left in State Courts it was our understanding that if these were legal seizures in the first place and what is different, why not go forward with them? There was no injunction issued against us for doing so so I don't think that can be held

against us that we were vigorously enforcing the law.[4]

Tr. at 162–63, 164.

To sum up the undisputed evidence before the Court: Officer Bardin, along with other Dallas police officers, seized property from Plaintiff's businesses on at least nine occasions. The seizures were part of the City's "widespread" and "across-the-board" effort to "vigorously enforce" Section 16.01. At all times, Bardin and the other officers were acting within the scope of their authority and in the course of their official responsibilities as police officers of the City of Dallas. In each case, Bardin and the other officers possessed a facially valid search warrant, signed by a neutral and detached magistrate, commanding them to seize the listed property under color of Section 16.01. Before each contested seizure of Plaintiff's property, Officer Bardin consulted with the Dallas District Attorney and received official assurance that seizures were proper under Section 16.01. Further, the Dallas City Attorney approved the policy of seizing video equipment under color of Section 16.01. These seizures continued after Plaintiff notified the City of them by filing his Complaint on April 23, 1990 and after the City persuaded the Court to abstain from enjoining the criminal prosecutions arising from the seizures. As the City Attorney said at the hearing, "we were vigorously enforcing the law" when the seizures recommenced after the Court's August 7 Order.

It is important to keep in mind that the contested policy in this case is not the City's seizure of property *per se* but the seizure of video equipment and peep show booths *under color of Section 16.01*. The Court finds that the evidence demonstrates that the contested seizures "may fairly be said to represent official policy...." *Monell v. New York City Department of Social Services*, 436 U.S. at 694, 98 S.Ct. at 2037. At the very least, the undisputed facts of this case reveal a "persistent, widespread practice of city officials or employees ... so common and well settled as to constitute a custom that fairly represents

municipal policy", knowledge of which is fully attributable to municipal officials with policy-making authority. *Bennett v. City of Slidell*, 735 F.2d at 862; *see Turner v. Upton County, Texas*, 915 F.2d at 136–37; *Mairena v. Foti*, 816 F.2d at 1065; *Crane v. Texas*, 766 F.2d at 194–95. After all, the undisputed evidence shows that the contested seizures constituted "widespread" and "across-the-board" enforcement of Section 16.01, that the City knew of the seizures, and that both the Dallas District Attorney and the City Attorney participated in the decisions to enforce Section 16.01 by seizing video equipment.

Accordingly, the imposition of liability upon the municipality is appropriate.

The City has repeatedly argued, at the hearing and in their present Motion to Reconsider, that Plaintiff has failed to prove that a finding of municipal liability is proper under *Monell* and its progeny. *See, e.g.*, Defendants' Motion to Reconsider at 4 (stating that "Plaintiff and Intervenor presented no evidence of a city policy to seize any property"). As the above discussion makes clear, the problem with the City's position is that the City's own pleadings and the undisputed evidence conclusively establish the existence of an "official policy or custom" under *Monell*. This conclusion is underscored by the City's deliberate and repeated refusal to deny that the many seizures of video equipment and peep show booths under color of Section 16.01 were conducted as part of an official policy or custom, despite being directly asked by the Court. Towards the close of the hearing, the following exchange took place.

MR. BRANDT (Assistant Dallas City Attorney): At this time I would also like to reurge my 41(b) motion for dismissal as far as the City is concerned. There had been no evidence that a policy maker adopted a policy that is unconstitutional causing damage to the Plaintiffs and the Intervenors. There has been at best evidence of the officers but no policy makers. There is no—

---

4. This statement is correct only as to raids upon Plaintiff Nobby Lobby, Inc.'s places of business. The City did raid Intervenor Circus, Circus,

Inc.'s place of business after the lawsuit was filed and before the Court entered its August 7, 1990 Order.

THE COURT: Are you going to say to me that this was done with the disapproval of policy makers? I cannot imagine this going on without it being approved by policy makers.

MR. BRANDT: Your Honor—

THE COURT: Would you argue that?

MR. BRANDT: Your Honor, it is the burden of the Plaintiffs to come forward and show—

THE COURT: I understand what the burden of proof is, Mr. Brandt. I am asking you, though, would you argue . . . that this is not City policy, that Mr. Bardin just does this all by himself?

MR. BRANDT: Your Honor, the policy as alleged by Plaintiffs is that we are engaging in censorship, prior restraint. That is not the policy of the City. In fact—

THE COURT: I am not asking you to give me a constitutional argument.

MR. BRANDT: Your Honor.

THE COURT: Just let me ask you the question and I will give you the opportunity to answer it.

What I am asking you is these seizures that have taken place, all of this evidence is here. Do you argue and are you arguing that is contrary to City policy?

MR. BRANDT: The seizures of the peep show booths?

THE COURT: What has been going on here. Is this against City policy?

MR. BRANDT: Your Honor, the seizures as they have taken place, we believe they are lawfully operated pursuant to 16.01. I am not going to enter into an admission in court that we have engaged in unconstitutional policy. That is what I am resisting.

THE COURT: . . . I will ask you for the third time and I will not ask you any more. Are you saying that these actions that have taken place, these seizures, are against City policy?

MR. BRANDT: There is no stated policies against these seizures.

THE COURT: Okay. Go ahead.

Tr. at 151–53.

In light of the great amount of evidence demonstrating that the contested seizures were performed according to City policy and custom as defined by *Monell* and its progeny and the City's statements that it was "vigorously enforcing the law" and that the seizures were "lawfully operated" and violated no policy, the Court finds that official policy or custom of the City of Dallas was the moving force behind the contested seizures.

IV. Texas Penal Code Section 16.01.

■ Plaintiff seeks a declaration that Section 16.01 of the Texas Penal Code is unconstitutional as applied to the property seized from Plaintiff's businesses by the City and an injunction preventing the City of Dallas from further seizures of peep show booth equipment under color of that statute. From Plaintiff's view, the present case is controlled by the Fifth Circuit's ruling in *Universal Amusement Co. v. Vance* and the equipment seized by the City clearly is not within the scope of Section 16.01. The City argues that the facts of this case are distinguishable from those of *Universal* and that, when the seized property is considered as a whole, it is prohibited by Section 16.01.

The Court first turns to the criminal statute at issue. Section 16.01 reads as follows.

**Section 16.01. Unlawful Use of Criminal Instrument.**

(a) A person commits an offense if:

(1) he possesses a criminal instrument with intent to use it in the commission of an offense; or

(2) with knowledge of its character and with intent to use or aid or permit another to use in the commission of an offense, he manufactures, adapts, sells, installs, or sets up a criminal instrument.

(b) For the purpose of this section, "criminal instrument" means anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense.

(c) An offense under subsection (a)(1) of this section is one category lower

than the offense intended. An offense under subsection (a)(2) of this section is a felony of the third degree.

Tex. Penal Code Ann. § 16.01 (Vernon Supp.1991).

The constitutionality of this statute was challenged in *Universal Amusement Co. v. Vance*, 404 F.Supp. 33 (S.D.Tex.1975), *vacated in part on other grounds sub nom. Butler v. Dexter*, 425 U.S. 262, 96 S.Ct. 1527, 47 L.Ed.2d 774 (1976), *aff'd in relevant part, Universal Amusement Co. v. Vance*, 559 F.2d 1286, 1293–1300 (5th Cir. 1977). The *Universal* case was strikingly similar to the case presently before the Court, in that it concerned the use of Section 16.01 to seize equipment used to project allegedly obscene material. In *Universal*, the district court first turned to the "Practice Commentary" accompanying the statute, noting that "[a]lthough the 'Practice Commentary' does not have the force of law, it does give us as much information as legislative history because, having been written by authorities in the field, it is intended for the practitioner who utilizes the newly enacted statute to give him a better idea of the statute's meaning." *Universal Amusement Co. v. Vance*, 404 F.Supp. at 48. The relevant portion of the Practice Commentary states that

> [The statute] aims at terminating incipient criminal activity, the existence of which is indicated by conduct involving a "criminal instrument." The mere possession or manufacture of things specially designed for the purpose of accomplishing a criminal objective is strong evidence of criminal intent. The instrument must be *specially* designed, made, or adapted for the commission of an offense, however; things frequently used in crime, but which have common, lawful uses, are excluded from the purview of Section 16.01 because possession of such things, alone, is conduct too ambiguous for imposition of the criminal sanction....

Tex. Penal Code Ann. § 16.01 Practice Commentary (Vernon 1974). The Practice

Commentary also stated that "ordinary tools are not covered" by the statute. *Id.*

The district court in *Universal* then found that from the Practice Commentary and from the language of the statute itself, "it can be seen that the statute is not a 'use' statute at all. Rather, it is a statute aimed at incipient crime—possession of a criminal instrument, with the specific intent to use the instrument in the commission of a crime.... [It is] not aimed at an instrument which has lawful uses...." *Universal Amusement Co. v. Vance*, 404 F.Supp. at 48.

The court then held that although the statute was not unconstitutionally overbroad, it was illegally used by law enforcement officials when they seized the film projection equipment.

> The statute, § 16.01 of the Texas Penal Code, is clearly drawn and very specific. Fault lies not with the legislature in this instance but with the local authorities who brought charges under this law. *The statute was obviously designed to deal with a very small class of property which can be used only for the commission of a crime and to deal with persons in possession of such property or engaged in the manufacture or adaptation of the property exclusively for use in criminal activities, before the criminal activities are undertaken or completed.*

*Id.* at 51 (emphasis added). The court concluded that "[b]y no stretch of the imagination" could Section 16.01 be applied to possession of ordinary projection equipment and declared that such application was unconstitutional. *Id.*

While the district court's decision in *Universal* was being appealed, the Texas Court of Criminal Appeals adopted the federal district court's analysis of Section 16.01. *See Fronatt v. State*, 543 S.W.2d 140, 142 (Tex.Crim.App.1976) (quoting *Universal Amusement Co. v. Vance*, 404 F.Supp. 33, 48, 51 (S.D.Tex.1975), and stating that "[w]e subscribe to the views stated in *Universal*").[5]

---

5. The City argues that "[t]he Court's analysis of § 16.01 is flawed" because the Court refers to

the 1974 Practice Commentary. Defendants' Motion to Reconsider at 12, 12–13. The City

When the Fifth Circuit considered *Universal,* it noted the Texas Supreme Court's adoption of the district court's construction of Section 16.01, *see Universal Amusement Co. v. Vance,* 559 F.2d at 1294 n. 17, and addressed the argument that "a projector has no lawful use when it carries a reel containing an obscene film." *Id.* at 1295. The Fifth Circuit flatly rejected that argument, stating that

> Section 16.01 punishes criminal intent, and it is possession of an obscene movie that evinces an intent to display illegal material; whether one also has a projector is irrelevant. This point is underscored by article 18.18 of the Texas Code of Criminal Procedure, which dictates destruction of any "criminal instrument," as that term is defined in the Penal Code. *This provision has its purpose in preventing criminal acts, a goal hardly advanced by junking theater projectors.*

*Id.* (emphasis added). Accordingly, the Fifth Circuit affirmed the district court's judgment that the statute was unconstitutionally applied to a movie projector used to project allegedly obscene movies. *See id.* at 1300.

The narrow interpretation of Section 16.-01 first stated by the district court in *Universal* and adopted by the Texas Court of Criminal Appeals in *Fronatt* consistently has been followed by Texas courts and convictions under the statute have been upheld only where the instrument was specially designed or made for use in the commission of a crime. *See, e.g., Carrasco v. State,* 712 S.W.2d 623, 625 (Tex.App.—Corpus Christi 1986, no pet.) (finding that "wire with loop at the end was specially designed or made for use in the burglary of vehicles and [defendant] admitted his intent to so use the wire"); *Simmons v. State,* 690 S.W.2d 26, 28 (Tex.App.—Beaumont 1985, no pet.) (finding that homemade key was a lockpick and its only use was in

burglaries of coin-operated machines); *see also Fronatt v. State,* 543 S.W.2d at 142–43 (finding lockpick to be specially designed for burglarizing coin-operated machines).

In contrast, where the allegedly criminal instrument was not specially made or adapted for use in commission of crimes but also was useful for lawful activities, the instrument has been found not to be a criminal instrument and the convictions under Section 16.01 struck down. For example, in *Eodice v. State,* 742 S.W.2d 844, 847 (Tex.App.—Austin 1987, no pet.), the court found that there was no evidence that a circuit tester was a criminal instrument even though it could be used in the commission of a crime. Also, the court found that the evidence was insufficient to establish that a feel gauge and a cotter pin were criminal instruments under Section 16.01, even though the cotter pin "had been bent into an 'L' shape and bore marks of being inserted and twisted in an unusual manner." *Id.* Finally, the court found that a flashlight and pry bar were not criminal instruments under the statute simply because the defendant had hidden them. Accordingly, even though the State had proved that the defendant had intended to use some of these instruments to commit burglary, because they were "ordinary, commonly available tools" that had not been specially adapted for the commission of crime, the court reversed the trial court and ordered an acquittal. *Id.*

In the most recent case to address Section 16.01, *Harris v. State,* 790 S.W.2d 778 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd), the Texas Court of Appeals reversed the conviction of a defendant for selling an electric service meter lockband key used to open electric meters. Despite testimony indicating that the device was sold to commit "meter tampering," because there was evidence that the lockband key had legitimate uses, the court found that there was

---

properly points out that Section 16.01 was materially changed by amendment in 1975. *See id.* at 13. The City fails, however, to demonstrate any flaw in the Court's reasoning and is unable to cite a single case suggesting that the Court erred in its analysis of Section 16.01. More

importantly, the City completely ignores the fact that *Fronatt v. State* was decided by the Texas Court of Criminal Appeals *after* Section 16.01 was amended and that the Texas Courts have followed *Fronatt* for fifteen years since that amendment.

818

no evidence that it was a criminal instrument. *See id.* at 780.

In the present case, there is no question that all of the property seized by the City has lawful uses. Indeed, the Dallas City Code expressly acknowledges that the booths and video equipment at issue in this case have legitimate and lawful uses. *See* Def.Ex. 1 (Dallas City Code) §§ 41A–1 (Purpose and Intent), 41A–2 (Definitions). Pursuant to the construction and application of Section 16.01 in *Harris v. State,* 790 S.W.2d at 779–80, that admission by the City ends the matter: because all of the seized property has lawful uses, it cannot have been " 'specially designed, made, or adapted' only, or even primarily, for use in the commission of a crime." *Id.* at 780; *see Universal Amusement Co. v. Vance,* 404 F.Supp. at 51 (finding that "[t]he statute was obviously designed to deal with a very small class of property which can be used only for the commission of a crime"). Indeed, so far as the video equipment used to show sexually explicit movies is concerned, this case is entirely controlled by the Fifth Circuit's ruling in *Universal Amusement Co. v. Vance.* Furthermore, common sense shows that the property seized by the City, some of which was purchased at Toys R Us, is not covered by Section 16.01.

■ Nonetheless, the City of Dallas argues that the peep show booths "are specially designed, made, or adapted for the commission of the following offenses: (1) violation of section 41A–19 of the Dallas City Code; (2) obscenity; (3) promotion of obscenity; (4) public lewdness; or (5) indecent exposure." Def. Proposed Finding of Fact 10. The City's argument is completely devoid of merit.

First, there is not a shred of evidence in this case that any of the property seized by the City was specially designed, made, or adapted for the commission of the offenses of obscenity or promotion of obscenity—the only offenses other than Section 16.01 mentioned in the warrants authorizing the seizure of Plaintiff's property. The City believes that "[t]he evidence is overwhelming that peep show booths are designed for the exhibition of obscene films. It is ludicrous to suggest that peep show booths were designed to show 'Mary Poppins' or 'The Ten Commandments.'" Defendants' Motion to Reconsider at 7. Obviously, the City confuses sexually explicit films with obscene films—a crucial distinction in First Amendment jurisprudence, and a distinction the City Attorney should know better than to blur. Although one easily could infer from the evidence that the peep show booths were specially designed, made, or adapted for showing sexually explicit movies, even tasteless and degrading sexually explicit movies, that is not an offense.

So far as the public lewdness and indecent exposure offenses are concerned, the Court first notes that these offenses were never mentioned in the warrants used to seize Plaintiff's property. Even had these offenses been listed by the law enforcement officials, the City's argument has little foundation in fact. Although the City presented some evidence that the peep show booths were specially designed, made, or adapted so that offenses could be committed within them, the City's witnesses also stated that the booths had lawful uses.[6] The Court cannot, and does not, find that because offenses may be committed inside the booths they are criminal instruments; to so hold would approach criminalizing ownership of a place where an offense is committed. In any event, because Section 16.01 "was obviously designed to deal with a very small class of property which can be used *only* for the

6. The City argues that Plaintiff's drilling of "glory holes" in the sides of some booths was a special adaptation of the booths for criminal purposes. This argument fails for several reasons. First, the City admitted that the glory holes had nothing to do with their seizures and prosecutions. *See* Tr. at 81, 139. Second, absolutely no evidence was offered showing that a person had ever been charged with public lewdness or indecent exposure in one of Plaintiff's peep show booths. Third, Officer Bernal, testifying for the City, stated that he preferred seizing free-standing booths (without glory holes) and usually did not seize the booth at all, but merely the video equipment. *See id.* at 87, 112–13. Fourth, the testifying officers conceded that peep show booths had lawful uses, with or without the glory holes. *See id.* at 110.

commission of a crime," *Universal Amusement Co. v. Vance*, 404 F.Supp. at 51 (emphasis added), the City's position must fail.

The City also argues that the peep show booths were specially designed, made, or adapted for the commission of the offense of violating Section 41A–19 of the Dallas City Code. That ordinance provides that "[t]he interior of the premises [where sexually explicit films or videos are shown] shall be configured in such a manner that there is an unobstructed view from a manager's station of every area of the premises to which any patron is permitted access for any purpose excluding restrooms" and that this "view area" must remain "unobstructed by any doors, walls, merchandise, display racks or other materials at all times...." Def.Ex. 1 at 10 (Dallas City Code § 41A–19(a)(5), (6)).

The City's position is both without merit and constitutes a transparent attempt to bootstrap a City Code violation up to a third-degree felony. First, as with other offenses already discussed, the City never listed this alleged City Code violation in any of its warrants, although it did enigmatically refer to "arcade violations." The appearance of this offense, like the offenses of public lewdness and indecent exposure, as a justification for the City's conduct at this stage of the proceedings is unexplained and further indicates that the City was aware its conduct was illegal all along. Also, it is telling that the City offers no reason at all for using this ordinance to seize video and computer equipment that obstructs no one's view of anything.

Second, the City presented no evidence that the peep show booths—which usually were not even mentioned in the warrants or seized—were specially designed, made, or adapted to violate Section 41A–19. Rather, the City simply concludes that the booths must have been designed, made, or adapted to violate the City Code because one cannot see into them. Under the City's interpretation of the law, any business that designed or manufactured "doors, walls, merchandise, display racks or other materials" that obstruct a person's view inside a

sexually oriented business in Dallas is guilty of a third-degree felony. Generally speaking, the people who design doors and walls do so precisely so that they obstruct views; the City apparently wants to criminalize the design and manufacture of a wall or door, at least when it is sold to a sexually oriented business.

Third, as already noted, the peep show booths have completely lawful uses, a point admitted by the City. "Where the instrument was not specially made or adapted for use in the commission of crimes but is also useful for lawful activities, the instrument is not a criminal instrument...." *Harris v. State*, 790 S.W.2d at 780. In short, the Court cannot, and does not, find that the peep show booths were " 'specially designed, made, or adapted' only, or even primarily, for use in the commission of a crime." *Id.*

Fourth, the City's position is internally inconsistent. The City takes pains to stress that Section 16.01 defines a criminal instrument as "anything, *the possession, manufacture, or sale of which is not otherwise an offense*, that is specifically designed, made, or adapted for use in the commission of an offense", Defendants' Motion to Reconsider at 13, *quoting* Tex. Penal Code Ann. § 16.01 (emphasis added by the City), yet at the same time argues that "Plaintiff's operation of peep show booths *is itself an offense* [under Section 41A–19 of the Dallas City Code]." *Id.* at 17–18 (emphasis added).

Finally, and importantly, the City's entire argument in this case is based on the unstated and unsupported assumption that the City may choose to enforce Section 16.01 even though there are specific laws governing the allegedly illegal behavior of Plaintiff. This position is completely without foundation and ignores basic Texas law.

### V. In Pari Materia.

■ It is well established in Texas that under the doctrine of in pari materia when a general statute and a more detailed law conflict, the latter will prevail. This doctrine was applied to Section 16.01 in *Ex Parte Harrell*, 542 S.W.2d 169 (Tex.Crim.

App.1976). In that case, a defendant was convicted under the criminal instrument statute for possession of a forged prescription with intent to use it in the commission of obtaining a controlled substance. The Texas Court of Criminal Appeals found that Section 16.01

> is a broad and general statute applicable to all types of possession of criminal instruments with intent to use them in the commission of an offense, while ... [Section 32.21 of the Penal Code] is a special statute dealing with possession of forged instruments.... The statutes are in pari materia and when construed together can be harmonized and given effect with the special governing the general in the event of any conflict.

*Id.* at 173.

"The issue in the present case is which statute controls when both statutes cover the offense involved." *Id.* It is clear that not only does Section 16.01 not properly apply to any of the property seized from Plaintiff, but also that the City Code and other provisions of the Texas Penal Code are more specific, and therefore the controlling, law. To put the matter simply, if the City wants to enforce City Code Section 41A–19, or any other law, it should just go ahead and enforce it; but it cannot pretend to enforce such laws by seizing property under Section 16.01.

This point deserves emphasis because of the City's persistence in pressing a constitutionally offensive argument: the City contends that because Plaintiff is guilty of numerous City Code violations, Plaintiff has forfeited its right to be protected from unconstitutional seizures of its private property. After noting that Plaintiff's employees have been convicted of 145 Dallas City Code violations and are accused of contempt of a court order, the City states that

> Plaintiff and Intervenor have no right to exist as sexually oriented businesses.

Despite this fact, Plaintiff and Intervenor knowingly persist in their illegal activities. Their flagrant violations of the law establish both their bad faith and their lack of standing to sue. If they are operating illegally, how can they have "clean hands?" If they have no right to exist, how can they have standing to sue? But for Plaintiff's and Intervenor's illegal acts, no seizures would have been able to take place. Had Plaintiff and Intervenor obeyed the law ... none of the seizures could have taken place because the businesses would have been closed.

Defendants' Motion to Reconsider at 18.

The gist of the City's argument is that the Constitution does not protect the rights of those who violate the Dallas City Code. The City's contention that a party does not have standing to complain of a deprivation of constitutionally protected rights because it has committed City Code violations— even scores of such violations—is so devoid of legal foundation as to be frivolous, and its attempt to exalt the Dallas City Code over the United States Constitution is fatuous.

The Court stresses that nothing in today's ruling prevents the City from enforcing state laws prohibiting obscenity, the promotion of obscenity, indecent exposure, and public lewdness. Likewise, the City may continue to enforce Dallas City Code provisions governing sexually oriented businesses. If Plaintiff's businesses do not deserve to exist under those laws, the City must use those laws to close the illegal businesses. The City may not, however, use violations of those laws as a pretext for depriving Plaintiff of constitutional rights by wrongfully applying Section 16.01, no matter how distasteful the City finds Plaintiff's presence in the marketplace and community.[7]

---

7. The City's intemperate Motion to Reconsider states that the Court "fail[s] to vigorously examine" the case; "ignore[s] well established legal doctrines"; "paint[s] with too broad a brush"; "assumes [facts] without proof"; "leap[s] beyond the bounds of fact, law and logic"; "is mistaken in its analysis"; and that "[t]he Court's analysis of § 16.01 is flawed", among many other shortcomings. The City never mentions or objects to the Court's analysis of the doctrine of in pari materia, however.

Accordingly, the Court GRANTS Plaintiff's motion for declaratory relief and DECLARES that Section 16.01 of the Texas Penal Code was unconstitutionally applied by the City of Dallas, Officer Bardin, and other Dallas police officers when they seized video equipment and peep show booths from Plaintiff's businesses under color of that statute.

### VI. Standards For Preliminary Injunctive Relief.

In the Fifth Circuit,

[t]here are four elements a movant must establish to obtain a preliminary injunction: (1) that there is a substantial likelihood of success on the merits; (2) that there is a substantial likelihood that he will suffer irreparable injury if the injunction is not issues; (3) that any threatened injury outweighs the damage the injunction might cause the opponent; and (4) that the injunction will not disserve the public interest.

*Griffin v. Box,* 910 F.2d 255, 259 (5th Cir. 1990) (citing *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (1984)).

In the present case, the Court finds that there is an overwhelming likelihood that Plaintiffs will succeed on the merits. As the above discussion indicates, there simply is no question that the City's cavalier use of Section 16.01 is unconstitutional.

Second, Plaintiffs have established that they will suffer irreparable harm if an injunction does not issue because they have demonstrated that the City's illegal actions violate their First Amendment rights.

The First Amendment of the Constitution provides: "Congress shall make no law ... abridging the freedom of speech...." This freedom is among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action; and municipal ordinances adopted under state authority constitute state action.

*Staub v. City of Baxley,* 355 U.S. 313, 321, 78 S.Ct. 277, 281, 2 L.Ed.2d 302 (1958) (quoting U.S. Const. amend. I and citing *Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938)). The Supreme Court has clearly held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality opinion) (Brennan, J.) (affirming preliminary injunction); *see Allee v. Medrano,* 416 U.S. 802, 814–16, 94 S.Ct. 2191, 2199–2201, 40 L.Ed.2d 566 (1974) (prohibiting police intimidation of union organizing campaign); *see also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 440 (1973) (stating that when deprivation of a constitutional right is shown, "most courts hold that no further showing of irreparable injury is necessary"). Damages simply are not an adequate remedy for the loss of intangible rights that cannot be bought or sold in the marketplace.

Third, the Court finds that the threatened injury to Plaintiffs far outweighs any injury an injunction might cause the City. Indeed, obeying the law is no injury at all to the City, whereas Plaintiff's First Amendment rights and property are threatened with great injury.

Finally, the public interest would not be disserved by issuing an injunction. Indeed, the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve. The City may, of course, enforce the criminal statutes prohibiting obscenity, the promotion of obscenity, indecent exposure, and public lewdness, and it may enforce city ordinances governing sexually oriented businesses. The City may not, however, use Section 16.01 in an unconstitutional manner as a surrogate for those more specific and appropriate laws—and, in so doing, transform misdemeanors into third-degree felonies.

### VII. Conclusion.

For the reasons stated above, the Court DENIES Plaintiff's motion to enjoin pending state criminal proceedings. Plaintiff Nobby Lobby, Inc. and Intervenor Circus, Circus, Inc.'s motion for declaratory and injunctive relief is GRANTED; the preliminary injunction entered April 4, 1991 pursuant to the March 28, 1991 Memorandum

Opinion and Order shall remain in effect. Defendants' Motion to Reconsider, Motion to Alter or Amend and Alternatively for New Trial is GRANTED to the extent reflected by this Opinion; in all other respects it is DENIED. Defendants' Motion to Amend and Make Additional Findings by the Court is GRANTED to the extent reflected by this Opinion; in all other respects it is DENIED.

SO ORDERED.