United States Court of Appeals,

Fifth Circuit.

No. 91–1638.

NOBBY LOBBY, INC., a Texas Corporation, d/b/a Fantasy Land, Plaintiff–Appellee,

and

CIRCUS, CIRCUS, INC., d/b/a Talk of the Town, Intervenor–Plaintiff–Appellee,

v.

CITY OF DALLAS, and R.E. BARDIN, in both his official and individual capacity, Defendants–Appellants.

Sept. 1, 1992.

Appeal from the United States District Court for the Northern District of Texas.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellants, the City of Dallas and Officer R.E. Bardin (collectively the City), challenge the district court's grant of declaratory and injunctive relief, barring the City from using § 16.01 of the Texas Penal Code to seize video and computer equipment and peep show booths from adult bookstores in Dallas, 767 F.Supp. 801. The City contends foremost that the *Younger* doctrine required the court to abstain in this case. Alternatively, the City argues that the court construed Texas's criminal instrument statute too narrowly and, regardless, erred in granting relief against the City itself. In addition to defending the court's grant of equitable relief, Nobby Lobby, Inc. d/b/a Fantasyland and Intervenor Circus, Circus, Inc. d/b/a Talk of the Town (collectively Nobby Lobby) also challenge this court's jurisdiction. Finding that the City properly perfected its appeal, we consider the merits and affirm.

I.

On April 11, 1990, Dallas police officers obtained a warrant from a Dallas municipal court magistrate to search Fantasyland, an adult bookstore owned by Nobby Lobby. The warrant commanded the police to search the store for and to seize an allegedly obscene videotape and, in

addition, the video projection and computer equipment used to show it. The following day, Officer R.E. Bardin and other Dallas police officers executed the warrant and seized the videotape and the video cassette recorder (VCR) in which they found it, other video projection and computer equipment, and an entire peep show booth. The Dallas County District Attorney later charged one of Nobby Lobby's employees with violating § 16.01 of the Texas Penal Code, under which the unlawful use of a criminal instrument is a third-degree felony.

The April 12, 1990 raid was not, however, the first such raid the Dallas police conducted. Starting in late 1988, the Dallas police searched a number of adult bookstores in the city and seized video and computer equipment pursuant to § 16.01. Included among these earlier raids were stores owned by Nobby Lobby. Consequently, on April 23, 1990, Nobby Lobby filed suit, under 42 U.S.C. § 1983, against the City, Officer Bardin, and five unnamed police officers in their official and individual capacities. The suit sought an injunction against the pending state criminal proceedings on the ground, *inter alia,* that application of § 16.01 to the items seized by the police was unconstitutional.

In an August 7, 1990 Order, the district court abstained from deciding Nobby Lobby's motion for preliminary injunction in accordance with the doctrine established in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The court abstained primarily because Nobby Lobby had not proved that the City had acted in bad faith or with an intent to harass. The court also concluded that Nobby Lobby could raise its constitutional challenge in the state court proceeding.

Apparently reading the court's order as an approval of its raids, the police conducted several additional seizures three days later on August 10, 1990. As a result of these raids, Nobby Lobby moved for reconsideration of the August 7, 1990 Order, arguing that the City's repeated seizures represented bad faith prosecution and harassment. The court granted the motion to reconsider and

held a hearing on Nobby Lobby's motion for preliminary injunction on March 25, 1991.[1]  At the hearing, the court considered only Nobby Lobby's request for declaratory and injunctive relief and not the issues of damages or attorneys' fees.

On March 28, 1991, the court entered a Memorandum Opinion and Order (March 28 opinion) in which it continued to abstain from enjoining the pending state criminal proceedings.  The district court, however, declared § 16.01 unconstitutional and entered a preliminary injunction against the City.  This order enjoined the City from seizing peep show equipment under color of § 16.01.  The court concluded that the City had acted in bad faith by repeatedly seizing Nobby Lobby's video and computer equipment despite its knowledge of this court's decision in *Universal Amusement Co. v. Vance,* 559 F.2d 1286 (5th Cir.1977).

The City then filed a motion to reconsider, to alter or amend the March 28 opinion and, alternatively, for a new trial on April 11, 1991.  Pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, the court vacated its March 28 opinion and entered an amended memorandum opinion on April 24, 1991.  In the amended opinion, however, the court again granted declaratory relief and an injunction against future unconstitutional seizures under color of § 16.01.  The court also continued to refuse to enjoin the pending state court proceedings, concluding that declaratory relief was less intrusive and produced the same effect.

On May 8, 1991, the City moved for reconsideration for a second time, urging the same arguments as in its first motion.  At the same time, the City also moved to recuse the district judge because he held a one percent interest in the company that owned the property on which Fantasyland

---

[1]Prior to the hearing, the court granted Circus, Circus, Inc.'s motion to intervene because Circus, Circus asserted claims virtually identical to Nobby Lobby's claims against the City.  The court also found that Officer Bardin was qualifiedly immune and dismissed Nobby Lobby's suit against him in his individual capacity.

was located.[2]  The court denied this motion on May 16, 1991, and the City filed its notice of appeal on June 14, 1991.  In this appeal, the City challenges the district court's decision not to abstain under Younger and to grant declaratory and injunctive relief.

## II.

Before addressing the merits of the City's appeal, we must first consider the threshold issue of our jurisdiction.  Nobby Lobby argues that this court lacks jurisdiction because the City did not perfect a timely appeal.  Under Rule 4(a)(1) of the Federal Rules of Appellate Procedure, a party must file its notice of appeal within thirty days after the date of entry of the judgment or order from which it appeals.  If the party files a timely motion under Rule 59 of the Federal Rules of Civil Procedure to alter or amend the judgment or for a new trial, however, "the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion."  Fed.R.App.P. 4(a)(4).  Nobby Lobby contends that the City's second motion to reconsider, filed May 8, 1991, failed to toll the time period for filing its notice of appeal.  If true, the City's June 14, 1991 appeal would be untimely for all orders except the denial of the City's motion to recuse, which itself is not a final appealable order.  See infra note 3.

In general, a second motion to reconsider does not interrupt the thirty-day period to appeal a judgment where the second motion raises " "substantially the same grounds as urged in the earlier motion.' " *Charles L.M. v. Northeast Indep. Sch. Dist.,* 884 F.2d 869, 870 (5th Cir.1989) (quoting *Ellis v. Richardson,* 471 F.2d 720, 721 (5th Cir.1973) (per curiam)).  Thus, if the City's second motion to reconsider merely re-urged grounds asserted in its first motion, the later motion could not toll the appeal period.  In fact, the second motion did, in large part, re-urge arguments made in the City's April 11, 1991 "Motion to Reconsider, Motion to Alter or Amend and Alternatively for New Trial."

---

[2]The company in which the judge had an interest had not leased the property directly to Nobby Lobby but, instead, to a third party, which, in turn, had leased it to Nobby Lobby.

Nevertheless, in the second motion, the City also moved the district judge to recuse himself, vacate the existing judgment, and grant a new trial because of newly discovered evidence, allegedly demonstrating that the judge had a financial interest in the outcome of the suit. Despite the similarities between the City's two motions, the first motion did not assert the trial judge's alleged bias as a basis for a new trial. Thus, the second motion, by presenting at least one completely different ground for relief from the judgment, interrupted the time allowed for filing an appeal, and the City's appeal was timely. The fact that the City filed an earlier motion to reconsider *on different grounds* does not change this result. Moreover, the fact that the motion to recuse is itself non-appealable also does not affect this result.[3]

## III.

The City argues initially that the district court erred by not abstaining pursuant to the abstention doctrine of *Younger v. Harris.* Under *Younger* and its companion cases, a federal district court must abstain from exercising jurisdiction over a suit when state criminal proceedings are

---

[3]In its appeal, the City seeks review of the district judge's refusal to disqualify himself under 28 U.S.C. § 455(a). We decline to review the court's denial of the City's motion to recuse, however, because the judge's decision is not an appealable interlocutory order under 28 U.S.C. § 1292(a). *Alexander v. Chicago Park Dist.,* 709 F.2d 463, 470–71 (7th Cir.1983). Cf. *In re Continental Inv. Corp.,* 637 F.2d 1, 5 (1st Cir.1980) (holding that a district judge's refusal to recuse himself is not an appealable final order under 28 U.S.C. § 1291 within the doctrine of *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)); *In re Corrugated Container Antitrust Litigation,* 614 F.2d 958, 960 (5th Cir.1980) (same), *cert. denied sub nom. Mead Corp. v. Adams Extract Co.,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).

"As the Supreme Court noted in *Thornburgh [v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 756–57, 106 S.Ct. 2169, 2176–77, 90 L.Ed.2d 779 (1986), *overruled on other grounds by Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ], on appeals from preliminary injunctions, usually the court of appeals will confine itself to consideration of so much of the case as is necessary to dispose of the question of whether the district court has abused its discretion in giving preliminary relief."* 9 James W. Moore et al., *Moore's Federal Practice* ¶ 110.25[1] at 291 (2d ed. 1992); *see also id.* at 297 ("The courts of appeals have been reluctant to review discretionary orders as incidental to the review of appealable interlocutory orders."). Instead, the City must await final judgment to appeal the judge's refusal to recuse himself. See *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1165 (5th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *In re Corrugated Container,* 614 F.2d at 960–61.

currently pending against the federal plaintiff. *Younger,* 401 U.S. at 41, 91 S.Ct. at 749. See also *DeSpain v. Johnston,* 731 F.2d 1171, 1175 (5th Cir.1984).[4] Therefore, because criminal proceedings were pending against Nobby Lobby's employees, the district court granted relief in a matter traditionally confined to the state judicial process.

*Younger* governs the present case despite the fact that neither Nobby Lobby nor Circus, Circus has been charged with a violation of § 16.01 of the Texas Penal Code, the criminal instrument statute. The Supreme Court addressed a similar situation in *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). In *Hicks,* no state criminal proceedings were pending against the appellee movie theaters by name at the time they filed their federal complaints. The state, however, had charged two of the appellees' employees and had seized copies of the movie "Deep Throat" from the theaters. The Court found that *Younger* applied to the theaters' federal complaints because they had a "substantial stake" in the state proceedings due to the fact that their interests were so intertwined with those of their employees. *Id.* 422 U.S. at 348, 95 S.Ct. at 2291. The appellees in the present appeal have a similar stake in the state proceedings such that *Younger* is relevant. The appellees' employees were charged under § 16.01, and the Dallas police seized video and computer equipment and other property, belonging to the appellees.

Moreover, *Younger* controls our review of this case even though the district court refused to enjoin the pending state prosecutions. The *Younger* doctrine applies not only to suits for injunctive relief, as in *Younger* itself, but also extends to suits for declaratory relief. *Samuels v. Mackell,* 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971). As the Court in *Samuels* recognized, "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid." *Id.* Thus, in the present case, the district court granted relief in a matter traditionally confined to the state

---

[4]The *Younger* doctrine reflects considerations of equity, comity, and federalism. *DeSpain,* 731 F.2d at 1175–76.

judicial process even though the court abstained from enjoining the pending prosecutions themselves.

Despite the strong policy consideration behind *Younger,* the Supreme Court has tempered the *Younger* rule of nonintervention with several exceptions. A federal plaintiff may overcome the presumption of abstention "in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown...." *Perez v. Ledesma,* 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971). *See also Younger,* 401 U.S. at 49, 91 S.Ct. at 753; *DeSpain,* 731 F.2d at 1176–77; *Shaw v. Garrison,* 467 F.2d 113, 119–22 (5th Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972). Relying on our prior decision in *Universal Amusement Co. v. Vance,* the district court found that the contested seizures and arrests were conducted in bad faith and with an intent to harass the appellees. The court concluded, therefore, that *Younger* did not require it to abstain from the merits of Nobby Lobby's suit. See *Nobby Lobby, Inc. v. City of Dallas,* 767 F.Supp. 801, 808 (N.D.Tex.1991). We review the district court's finding of bad faith and harassment under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Shaw,* 467 F.2d at 122.

Our first step in evaluating the district court's findings and conclusions is a consideration of our decision in *Universal.* In *Universal,* the San Antonio police seized the movie "Deep Throat" and the movie projector used to show it from a local theater several times within a two-week period. The police arrested and later charged the theater's operator and an employee with the misdemeanor offense of commercial obscenity, under § 43.23 of the Texas Penal Code, and with the felony offense of possessing a criminal instrument, the movie projector, under § 16.01 of the Texas Penal Code. *Universal,* 559 F.2d at 1293–94. The Fifth Circuit affirmed the district court's finding of bad-faith harassment under *Younger* and enjoined all felony prosecutions against the theater's operator and employee. *Id.* at 1294.

In reaching this conclusion, we highlighted three factors that established bad faith on the part of the defendants. First, we found that the seizure of the movie projector itself provided "substantial support for the district court's finding of harassment and prosecution in bad faith." *Id.* at 1295. The court affirmed the district court's holding that § 16.01 was clearly inapplicable to film projectors and, consequently, concluded that its application evidenced bad faith and harassment.[5] Second, the court noted that the "multiplicity of the seizures dispe[lled] the likelihood of an honest mistake to the same extent that the language of Section 16.01 must have dispelled any hope of obtaining [the federal plaintiff's] conviction." *Id.* Third, we observed that the district attorney had failed to seek grand jury indictments on the felony charges under § 16.01, which prevented the federal plaintiff from raising his constitutional claims in the state court proceedings. *Id.*

We turn next to a consideration of *Universal* in light of the facts of the present case. First, as we discuss more fully in part IV, the language of § 16.01 provides equal support for a finding of bad faith and harassment where the police seize video equipment used to show sexually explicit films as where they seize a movie projector. Any suggestion that the court should treat a video cassette recorder (VCR) and a television monitor differently than a film projector strains credulity.

Second, the multiplicity of the seizures by the Dallas police of the appellees' video projection and computer equipment, as well as the charges brought against their employees under § 16.01, further support the district court's finding. Officer Bardin and other Dallas police officers executed warrants and seized property at: Video Stop on May 17, 1989, Talk of the Town on October 20, 1989, Fantasyland on April 12, 1990, Kazbah and Videoland on April 20, 1990, Talk of the Town on July 12, 1990, and Fantasyland, Eros, and Videoland on August 10, 1990.[6] Of particular significance here is the fact that the August 10, 1990 seizures occurred only three days after the

---

[5]We discuss this holding and the proper construction of § 16.01 in greater detail in part IV.

[6]Nobby Lobby operates all of these stores except Talk of the Town, which Circus, Circus owns.

district court's initial decision to abstain. The district court was entitled to consider the police's en masse seizures immediately after its decision to abstain as patently harassing. At this point, the City must have been aware of the strong possibility that the seizures were unconstitutional. Nevertheless, instead of waiting for the state courts to decide this question, the police immediately conducted additional seizures. *Cf. id.* at 1296–97 (San Antonio police's repeated seizures of film and projector instead of attempting to ban film as obscene constituted harassment); *Krahm v. Graham,* 461 F.2d 703, 707 (9th Cir.1972) (multiple prosecutions); *Video Store, Inc. v. Holcomb,* 729 F.Supp. 579, 580 (S.D.Ohio 1990) (same).

Further, the district court was entitled to consider as significant the extent of the seizures. In conducting these seizures, the police did not seize merely one video cassette or even one peep show booth. Instead, the police seized VCRs, computers, and electronic equipment that allowed the showing of a number of films in different booths, connected to the same VCR by common electrical components. As the district court found, "the effect of the contested seizures was not only to prevent the showing of one allegedly obscene film, but to prevent the showing of any film in the affected booths until replacement parts could be obtained and installed." *Nobby Lobby,* 767 F.Supp. at 808.

Third, and most importantly, the seizures, arrests, and prosecutions in this case all occurred after our decision in *Universal.* Many of these actions took place, in fact, after the appellees filed suit, based on *Universal,* to enjoin such conduct. This factor, of course not present in the prior case, provides additional support for the district court's finding.

The record contains undisputed evidence that the officials, including Officer Bardin and the assistant district attorneys, who made the decision to seize the video equipment and other property were fully aware of the *Universal* ruling. Moreover, as *Universal* noted and as we discuss in part IV, the Texas Court of Criminal Appeals, the highest court for criminal matters in Texas, had embraced the narrow construction of § 16.01 in the district court's opinion in *Universal.* We agree with the

district court that the actions of these officials in light of *Universal* raises a strong inference of bad faith.

Finally, the facts of this case do differ in one important respect from those in *Universal.* While in *Universal,* the district attorney did not seek indictments under § 16.01, in the present case, the district attorney obtained several convictions. As the district court observed, however, these convictions resulted from plea agreements, and no case proceeded to trial. The fact that several defendants—a foundering business and its employees—chose to plead guilty and, thereby, avoid the costs of trial and later appeals does not represent very strong proof that the City had a good faith belief in the likelihood of gaining valid convictions, especially in light of *Universal.* The lack of good faith is particularly telling in the present case where the City elected to charge only low-level employees of Nobby Lobby. Such employees obviously have limited means to litigate constitutional issues and are likely to enter a plea if one is available. Therefore, for the reasons stated above, the district court did not err in declining to abstain under *Younger.* See *DeSpain,* 731 F.2d at 1177; *Wilson v. Thompson,* 593 F.2d 1375, 1383 (5th Cir.1979).

IV.

We address separately now the propriety of the district court's declaratory relief. The district court determined that § 16.01 as applied to the property the City seized from Nobby Lobby was unconstitutional, relying on *Universal Amusement Co. v. Vance,* 404 F.Supp. 33 (S.D.Tex.1975), *vacated in part on other grounds sub nom. Butler v. Dexter,* 425 U.S. 262, 96 S.Ct. 1527, 47 L.Ed.2d 774 (1976), *aff'd in relevant part, Universal Amusement Co. Vance,* 559 F.2d 1286, 1293–1300 (5th Cir.1977), *cert. denied sub nom. Butler v. Dexter,* 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 296 (1979).[7] The City argues that the court ignored the Texas state courts' recent efforts

---

[7]Section 16.01 of the Texas Penal Code provides:

    (a) A person commits an offense if:

        (1) he possesses a criminal instrument with intent to use it in the

to broaden the *Universal* analysis and misapplied it with respect to the facts of this case.  We consider these arguments in turn.

The district court in *Universal* held that

> [t]he statute [§ 16.01] was obviously designed to deal with a very small class of property which can be used only for the commission of crime and to deal with persons in possession of such property or engaged in the manufacture or adaptation of the property exclusively for use in criminal activities, before the criminal activities are undertaken or completed.

*Universal,* 404 F.Supp. at 51.  In reaching this conclusion, the district court relied on the language of § 16.01 and also the statute's "Practice Commentary," which the court likened to a legislative history.  The "Practice Commentary" for § 16.01 states:

> [Section 16.01] aims at terminating incipient criminal activity, the existence of which is indicated by conduct involving a "criminal instrument."  The mere possession or manufacture of things specially designed for the purpose of accomplishing a criminal objective is strong evidence of criminal intent.  The instrument must be *specially* designed, made, or adapted for the commission of an offense, however;  things frequently used in crime, but which have common, lawful uses, are excluded from the purview of Section 16.01 because possession of such things, alone, is conduct too ambiguous for imposition of criminal sanctions....

V.T.C.A., Penal Code § 16.01 Practice Commentary.

On appeal, this court affirmed the district court's construction of § 16.01.  Importantly, we also noted that during the pendency of the appeal the Texas Court of Criminal Appeals had adopted

---

commission of an offense;  or

(2) with knowledge of its character and with intent to use or aid or permit another to use in the commission of an offense, he manufactures, adapts, sells, installs, or sets up a criminal instrument.

(b) For the purposes of this section, "criminal instrument" means anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense.

(c) An offense under Subsection (a)(1) of this section is one category lower than the offense intended.  An offense under Subsection (a)(2) of this section is a felony of the third degree.

the district court's view of the statute. *Universal,* 559 F.2d at 1294–95 n. 17 (citing *Fronatt v. State,* 543 S.W.2d 140, 142 (Tex.Crim.App.1976)). The Texas courts have continued to adhere to the narrow construction of § 16.01 in *Universal* and *Fronatt.*

As a result, Texas courts have upheld convictions under § 16.01 only where the instrument was specially designed or made for use in the commission of a crime. See *Carrasco v. State,* 712 S.W.2d 623, 625 (Tex.App.—Corpus Christi 1986, no pet.) (upholding conviction where "wire with loop at the end was specially designed or made for use in burglary of vehicles and appellant admitted his intent to so use the wire"); *Simmons v. State,* 690 S.W.2d 26, 28–29 (Tex.App.—Beaumont 1985, no pet.) (affirming conviction for use of homemade coin-operated machine key to open coin boxes at a laundromat). See also *Fronatt,* 543 S.W.2d at 142–43 (finding that lock picks constituted criminal instruments).

On the other hand, the Texas courts have held that an instrument is not a *criminal* instrument "[w]here the instrument was not specially made or adapted for use in commission of crimes but is also useful for lawful purposes." *Harris v. State,* 790 S.W.2d 778, 790 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd) (reversing conviction under § 16.01 for selling electric service meter lockband key where court found legitimate uses for key in addition to intended use of "meter tampering"). See also *Eodice v. State,* 742 S.W.2d 844, 846–47 (Tex.App.—Austin 1987, no pet.) (per curiam) (finding no evidence supported district court's conclusion that circuit tester, feel gauge, flashlight, pry bar, or cotter pin bent into "L" shape were criminal instruments).

The City argues, however, that in *Eodice* the state court departed from the *Universal* analysis to give the State greater flexibility in applying § 16.01. In *Eodice,* the court stated:

> In order to be a criminal instrument within the meaning of the statute, it is not enough that an object can be used to commit a crime. Rather, the object must be one that, as designed, made, or adapted is distinctively or peculiarly suited to accomplishing a criminal objective. While the opinion in *Universal Amusement* may have overstated the point by suggesting that

the commission of a crime must be the *only* use for a criminal instrument, it is certainly clear from the statutory definition that the commission of a crime must be the object's *primary* purpose.

*Id.* at 846 (footnote omitted). While it is true that this language suggests an attempt to relax the *Universal* analysis, the actual change, if any, is limited.

Even under *Eodice,* the prosecution must prove that the instrument was specially designed, made, or adapted primarily, if not solely, to commit a crime. Furthermore, contrary to the City's assertion, the court never expressed a desire to give prosecutors more flexibility in using this statute. In fact, despite the language emphasized by the City, the *Eodice* court found that items such as a pry bar, an electric circuit tester, a flashlight, and a feel gauge were not criminal instruments even when found on a person standing in a pawn shop doorway at two o'clock in the morning. The court also found the evidence insufficient to establish that a bent cotter pin had been specially adapted for burglarizing the store. Consequently, the court's statement does not evince an intent to construe § 16.01 broadly.

The district court correctly concluded, therefore, that the City failed to prove that the property seized from Nobby Lobby "was "specially designed, made, or adapted' only, or even primarily, for use in the commission of a crime." *Harris,* 790 S.W.2d at 780 (citing *Eodice,* 742 S.W.2d at 847). The property seized during the raids falls into several categories: (1) video and audio equipment, such as, monitors, speakers, and VCRs; (2) computer equipment, such as, computers, monitors, and keyboards; (3) electronic equipment, such as, coaxial cables, splitters, video connectors, modulators, AC/DC power supplies, and wiring; and (4) peep show booths. To prevail, the City must demonstrate that the items in one or more of these categories fits within § 16.01's narrow definition of a criminal instrument.

The items in the first three categories have obvious lawful purposes and, therefore, do not fall within the purview of § 16.01. See *Universal,* 404 F.Supp. at 48. As we stated in *Universal,*

"Section 16.01 punishes criminal intent, and it is possession of an obscene movie that evinces an intent to display illegal material; whether one also has a projector is irrelevant." *Universal,* 559 F.2d at 1295. This statement applies with equal force to computers and electronic supplies, such as, coaxial cables and splitters. Possession of these items, whether separately or together, does not evince an intent to display illegal material.

On appeal, therefore, the City focuses on the peep show booths. The City argues that Nobby Lobby manufactured and installed the booths intending that its patrons would use them to commit acts of public lewdness and indecent exposure. The City bases its position first on its contention that the "peep show booths are specially designed for the exhibition of, *at the very least, sexually explicit movies.*" Brief of Appellants at p. 37 (emphasis added). As the district court recognized, however, the peep show booths were not specially designed, made, or adapted for showing such movies because any type of movie could be shown inside the booth.

The City also contends that Nobby Lobby specially adapted the booths to promote public lewdness and indecent exposure by drilling "glory holes" in the sides of some booths. According to the City and one of its witnesses, glory holes, drilled in the common wall between adjoining booths, allow sexual interaction between patrons in the booths. This argument would have some force if the record revealed that the seized booths had glory holes in them. Although one witness testified that Nobby Lobby drilled glory holes in its booths, the record contains no evidence that any of the seized booths contained glory holes. In fact, Officer Bernal testified that he preferred to seize free-standing booths, which were easier to remove and caused less damage, rather than booths installed with common walls in which glory holes could be drilled. Also, Officer Bardin admitted that the glory holes had nothing to do with the seizures and prosecutions and that this justification arose only after the filing of the lawsuit.[8] Finally, the City offered no evidence that anyone had ever been charged

---

[8]In fact, no warrant or supporting affidavit even mentioned the peep show booths, let alone the glory holes, before those used to support the August 10, 1990 raids.

with public lewdness and indecent exposure for acts committed in one of Nobby Lobby's booths.

The City argues lastly that Nobby Lobby's maintenance of the booths violates a Dallas city ordinance requiring "an unobstructed view from a manager's station of every area of the premises to which any patron is permitted access." Dallas City Code § 41A–19(a)(5). According to the City, this alleged violation represents further proof that Nobby Lobby intended the booths to be used for the commission of offenses. We agree with the district court, however, that this argument, as with the glory holes, is nothing more than an afterthought unsupported by the record.[9] The City never listed this alleged violation of the City Code in any of its warrants. Moreover, the City presented no evidence that the peep show booths, which were not even mentioned in most of the warrants, were specially designed, made, or adapted to violate § 41A–19.

V.

The City argues next that the district court erred in granting declaratory and injunctive relief against it because Nobby Lobby failed to prove that the police officers acted pursuant to an official city policy or custom. The City contends that, absent proof that a city policy or custom guided the officers' conduct, the Supreme Court's decision in *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), prevents a court from holding it liable for its officials' actions. Having reviewed the record, we are persuaded that the evidence supports the district court's finding that Officer Bardin and the other officers were acting pursuant to a city custom or policy. Consequently, the district court properly determined that declaratory and injunctive relief could issue against the City itself.

In *Monell,* the Supreme Court held that Congress had intended municipalities to be subject to suit under § 1983 but only where execution of an official policy or custom of the municipality

---

[9]The very existence of Dallas's Sexually Oriented Business Ordinance suggests that Nobby Lobby's business is not inherently illegal and that its equipment, therefore, has lawful uses.

resulted in the deprivation of a constitutional right. *Id.* at 690, 98 S.Ct. at 2035. The Court explained that

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as a entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037–38. The purpose behind the Court's reasoning in *Monell* was to ensure that municipalities would not be held liable under the theory of *respondeat superior. Id.* at 691–93, 98 S.Ct. at 2036–37. As the Court observed in a later opinion,

> [t]he "official policy' requirement was intended to distinguish the acts of the *municipality* from the acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986).

> Since *Monell,* we have defined "official policy" as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

> 2. A *persistent, widespread practice of city officials or employees,* which, although not authorized by officially adopted and promulgated policy, is so *common and well settled* as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc) (per curiam) (emphasis added), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). See also *Matthias v. Bingley,* 906 F.2d 1047, 1055 (5th Cir.1990); *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 759 (5th Cir.1986), *aff'd in part,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.) (en banc) (per curiam), *rev'd on other grounds,* 739 F.2d 993

(5th Cir.1984) (en banc).

Over a two-year period, Officer Bardin and other Dallas police officers seized property from Nobby Lobby's businesses on at least nine occasions. On each of these occasions, the Dallas police first obtained a search warrant from a municipal court magistrate, which commanded the police to seize the listed property under color of § 16.01. In addition, before initiating the seizures and arrests, the Dallas police consulted with the Dallas County District Attorney's office, which assured the officers that the seizures were proper under § 16.01. More importantly, the officers also discussed the proposed seizures with the Dallas City Attorney's office, which likewise approved seizing the video and other equipment under § 16.01.[10]

It is apparent from these facts that the seizures at issue in this case were not isolated incidents. The seizures also were not the result of one, or a few, renegade police officers. On the contrary, as the district court found, "[t]hese seizures were part of the City's "widespread' and "across-the-board' effort to "vigorously enforce' Section 16.01." *Nobby Lobby,* 767 F.Supp. at 814.[11] The fact that the

---

[10]Officer Bernal, who participated in a number of the seizures, testified at the preliminary injunction hearing that:

> Q: Back in 1988 other than the discussion you have told us about did you have any discussion with the City Attorney's office concerning—concerning the use of 16.01, criminal instrument statute, in City prosecutions?
>
> A: All of the obscenity statutes or enforcements that we had we always had discussions with City Attorneys and District Attorneys and as many lawyers as we could find before we did this so I would have to say, yes, we spoke to the City Attorney....
>
> Q: Would it be fair to say that no one in the policy making decisions of the City of Dallas never [sic] told you to discontinue this, stop it, don't do it?
>
> A: No one has ever told me that, no, sir.

Tr. 107.

[11]The City in its September 20, 1990 Defendant's Response to Plaintiff's Motion for Reconsideration, in disclaiming any intent to harass Nobby Lobby, stated:

> If the incidents show anything at all, they tend to show that Defendants have

seizures continued not only after Nobby Lobby filed suit against the City but even after the City persuaded the court to abstain to allow the state courts to consider the constitutionality of the seizures adds further support for Nobby Lobby's claim that the seizures represent City policy.

Therefore, this two-year course of seizing video and other equipment under § 16.01 represents a persistent, widespread practice sufficient to constitute municipal policy. Moreover, the City's involvement at various levels in the seizures demonstrates that it must have had actual or constructive knowledge of the seizures. Consequently, the court did not err in finding that the officers made their § 16.01 seizures pursuant to an official city policy or custom.[12]

## VI.

The City raises two final issues. First, the City argues that the district court erred in ignoring the City's argument that the court should not have granted equitable relief because Nobby Lobby had "unclean hands" and lacked standing. In sum, the City contends that because Nobby Lobby allegedly has violated Dallas' Sexually Oriented Business Ordinance, Chapter 41 of the Dallas City Code, Nobby Lobby should be estopped from challenging the police's enforcement of § 16.01. This argument completely lacks merit. Contrary to the City's assertion, the district court not only

---

> enforced the criminal instrument statute in good faith and *across-the-board.* The instances alleged indicate that enforcement efforts are *widespread* and *not* a singling out of Plaintiff's business for any sort of bad faith harassment.

R. 210 (some emphasis added).

[12]In *Chaloux v. Killeen,* 886 F.2d 247 (9th Cir.1989), the Ninth Circuit held that a plaintiff need not establish an official custom or policy under *Monell* to obtain purely prospective relief against a municipality or its officials for enforcing allegedly unconstitutional state laws. The Ninth Circuit reasoned that the policy justifications for prohibiting vicarious liability against municipalities in damage suits is absent in suits for injunctive and declaratory relief. Cf. *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980) (declaring state statute unconstitutional despite finding county not liable for damages, under *Monell,* because county official had not acted pursuant to county policy); *see also* Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation* § 6.17, at 492–93 (3d ed. 1991). Because substantial evidence supports the district court's finding that the officers' conduct in this case was pursuant to a city policy we express no opinion on whether a plaintiff must establish a municipal policy or custom to obtain declaratory relief against a municipality.

considered the City's unclean hands and standing arguments but also properly rejected them.

The district court held that

> [t]he City's contention that a party does not have standing to complain of a deprivation of constitutionally protected rights because it has committed City Code violations—even scores of such violations—is so devoid of legal foundation as to be frivolous, and its attempt to exalt the Dallas City Code over the United State's Constitution is fatuous.

*Nobby Lobby,* 767 F.Supp. at 820. Nothing in the relief granted by the court prevents the City, in any way, from enforcing its Sexually Oriented Business Ordinance or any state law prohibiting obscenity or similar conduct. If Nobby Lobby has violated any of those laws, the City may take whatever action is appropriate against Nobby Lobby under those laws. The City may not, however, predicate its unconstitutional application of § 16.01 on any violations of those laws.

Similarly, the district court correctly rejected the City's contention that granting equitable relief disserves the public interest. The district court eloquently concluded that:

> Indeed, the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve. The City may, of course, enforce the criminal statutes prohibiting obscenity, indecent exposure, and public lewdness, and it may enforce city ordinances governing sexually oriented businesses. The City may not, however, use Section 16.01 in an unconstitutional manner as a surrogate for those more specific and appropriate laws—and, in so doing, transform misdemeanors into third-degree felonies.

*Id.* at 821.

Second, the City argues that the court erred in allowing Nobby Lobby's witness Kurt Whitting to testify even though Nobby Lobby neither designated him as a witness in answering the City's interrogatories nor listed him in the joint pretrial order. Whether "we treat the court's ruling as an amendment of the pretrial order under rule 16(e) [of the Federal Rules of Civil Procedure] or a refusal to impose sanctions upon [Nobby Lobby] for violating rule 26(e)(1) [of the Federal Rules of Civil Procedure]," we must determine whether the court's ruling represents an abuse of discretion. *Bradley*

*v. United States,* 866 F.2d 120, 124 (5th Cir.1989).

We review the court's exercise of discretion in allowing Whitting to testify according to the following factors: (1) the prejudice to the opposing party of allowing the witness to testify; (2) the importance of the witness's testimony; (3) the possibility of curing any prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness. *Geiserman v. MacDonald,* 893 F.2d 787, 791 (5th Cir.1990); *Bradley,* 866 F.2d at 125. Neither party has presented any arguments on the third or fourth factors, so we focus our attention on the first two factors.

The City argues that the court's decision to allow the testimony resulted in "trial by ambush" and that the City was not able to prepare itself adequately to cross-examine Whitting. Despite Nobby Lobby's failure to list Whitting in the March 11, 1991 pretrial order, however, Nobby Lobby did name him as a potential witness four days later in its "Supplemental Additional Pre–Trial Requirements." The City had ten days before the hearing, therefore, to prepare to cross-examine this witness but gives no explanation for why it required more time.

Regardless, neither the district court's opinion nor the record itself suggests that Whitting's testimony was very important. Whitting's testimony at the hearing only concerned the construction of the peep show booths and the electronic components employed to send signals to the different booths. Whitting provided mostly background information for understanding how the peep show booths actually work.

The City does not explain how the admission of such evidence prejudiced its defense. Furthermore, the City does not indicate what it might have been able to establish during cross-examination if it had had more time to prepare for this witness. Consequently, nothing in the City's argument suggests that a continuance would have substantially aided the City's preparation.

Lacking any proof of prejudice to the City, we find that the district court did not abuse its discretion in admitting this evidence.

## VII.

For the above reasons, we affirm the district court's order granting a preliminary injunction and related declaratory relief against the City of Dallas.

AFFIRMED.